**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) |
| AKEEM DANIELS, | ) |
| | ) |
| and ALL OTHERS | ) |
| SIMILARLY SITUATED, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| | ) |
| FANDUEL, INC., | ) |
| | ) |
| Defendant. | ) |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) |

**CLASS ACTION COMPLAINT**

Plaintiff Akeem Daniels, by his counsel, brings this Class Action against Defendant FanDuel Inc. ("FanDuel") for himself and for all others similarly situated, alleging as follows:

**NATURE OF ACTION**

1. The daily fantasy sports ("DFS") industry is "exponentially growing."[1] In the operation and sale of online daily fantasy college football and basketball gaming products, Defendant has knowingly and improperly exploited the accomplishments, and expected future accomplishments, of former Northern Illinois University football player Akeem Daniels and as many as 2,000 or more other college football and basketball players whose names Defendant has purported to market and sell as "fantasy" athletes available for sale to members of the general public. These athletes play or have played basketball or football for colleges and universities

---

[1] https://www.fanduel.com/insider/2015/09/03/6-strategies-for-setting-your-fanduel-college-football-lineups/ (last visited Dec. 13, 2015).

typically affiliated with one of several conferences, including the Atlantic Coast Conference, the Big Ten Conference, the Big 12 Conference, the Pacific-12 Conference, the Mid-American Conference, and the Southeastern Conference. Through a comprehensive advertising campaign and in its daily fantasy college football and basketball contests, Defendant routinely use the names and likenesses of these college players to promote Defendant's commercial enterprise, amassing millions of dollars in revenues from entry fees, without the athletes' authorization. Plaintiff and the proposed Class Members have not given their consent to Defendant's blatant misappropriation of their names and attendant rights. Nevertheless, Defendant continues to promote and to operate its daily fantasy college football and basketball contests on the backs of college players, whose popularity and performance make the Defendant's commercial daily fantasy college football and basketball product possible.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff Akeem Daniels is an individual who played college football from 2010 to 2014 in DeKalb, Illinois for the Northern Illinois Huskies and was a starting tailback for the team. He matriculated at Northern Illinois ("NIU") in August 2010 and graduated from the university in December 2014 with a Bachelor of Science degree in Business/Corporate Communications.

3.      Plaintiff worked arduously to attain his positions as a member of the varsity football team for Northern Illinois University, practicing for thousands of hours dating to his adolescence.

4.      This case involves Defendant's implementation of a business plan designed to profit on Plaintiff's name and on-field athletic successes and efforts, and those of other college athletes, without compensating them.

5.      Defendant FanDuel is a Delaware corporation, based in New York City, New York, that has created online fantasy games that seek to capitalize on the names, likenesses, and

performances of Plaintiff and other college athletes both as part of their fantasy contests and to promote the fantasy contests.

7.     The Court has jurisdiction under 28 U.S.C. § 1331.

8.     Under the Class Action Fairness Act of 2005, this Court has jurisdiction as the amount of damages sustained by the Class exceeds five million dollars.

9.     This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in the district.

10.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendant transacts substantial business in this district and acts alleged herein, including the trading upon Plaintiff's name, took place within this District.

## FACTS

11.     The daily fantasy sports commercial market is a multi-billion-dollar industry.

12.     The industry on the whole is projected to generate $2.6 billion in customer entry fees in 2015, according to one study.[2]  FanDuel is one of the two largest companies in the DFS industry, as measured by revenue.

13.     Upon information and belief, Defendant was founded in January 2009.

14.     Defendant runs online interactive games in a fashion that the New York State Attorney General has likened to a "casino-style gambling operation."[3]   In the Defendant's online interactive games, a customer of Defendant pays Defendant an entry fee and in exchange is given

---

[2] *See* "Yahoo Will Enter Daily Fantasy Sports Market," July 8, 2015, NEW YORK TIMES, http://www.nytimes.com/2015/07/09/technology/yahoo-will-enter-daily-fantasy-sports-market.html?_r=0 (citing study by Eilers Research).
[3] *See* http://www.ag.ny.gov/pdfs/DK_Complaint.pdf, at ¶ 3.

virtual Defendant currency to use during this online game to purchase the services of individual players and thereby build a virtual or "fantasy" team of college athletes.

15.     The Defendant also separately offers to allow customers to create, and profit from the creation of, virtual teams of professional athletes.

16.     Division I college basketball and football players' names and publicity rights are being sold by the Defendant.  The Defendant's customers use those purchases to compete against other users in Defendant's online games.  At the conclusion of each day, a given customer is monetarily rewarded—or on the other side of the spectrum, can lose money—based on the college players' performance in real-life games against collegiate opponents.

17.     The business model itself is built upon the assurance, as offered in the words of Defendant, that unpaid amateur college athletes will "put up some big performances for [our] customers," and thereby make money for the Defendant's customers.

**Defendant's Business Model for Selling College Players' Services
and Trading on College Players' Names**

18.     Defendant's entire business model is predicated on trading upon the Class Members' names and predicted future athletic success, much in the manner of trading stocks on the New York stock exchange.

19.     The Defendant's personnel summarize their system as one of

"Choose Your League for the Day"

"Pick The Players You Want"

"Know if You Win THAT Night"[4]:

---

[4] https://www.fanduel.com/about



20.     As described below, in daily fantasy college football and basketball, each college player whose name appears on Defendant's websites as someone who is eligible to be "owned" by a FanDuel customer (*i.e.*, each Class Member) is equally integral to the Defendant's implementation of their unlawful scheme.

21.     Pursuant to the Defendant's scheme, Defendant sells purported 'ownership' stakes in the players themselves, and the Defendant's customers benefit, financially, from the asserted ownership of the players.

22.     Defendant's customers access a personal account with Defendant, created and maintained by Defendant on a server, through an Internet browser or through Defendant-created mobile platforms.

23.    FanDuel began offering college basketball gaming contests to the public in November 2011.    FanDuel began offering college football gaming contests to the public in October 2012.   FanDuel also offers fantasy gaming contests for the following U.S. professional sports: baseball (MLB), football (the NFL), and hockey (the NHL).

24.    After a user has activated his account and paid to enter a Defendant-managed college basketball or football contest, he or she can compile a roster of college players by "purchasing" currently active college athletes according to their name, position, university, and the "salary" amount assigned to the athlete (discussed below).

25.    In Defendant's college daily fantasy college football and basketball games, the customer wins or loses money based upon the combined performance that same day of the athletes selected by the customer.

26.    Thus, in the Defendant's college football and basketball contests, Defendant purports to offer its users the opportunity to purchase the services of college players for the Defendant's customers' daily fantasy teams under a Defendant-created "salary cap"[5] for that day. For each fantasy contest, the Defendant assigns each college player (including Plaintiff) a "salary" based on the college player's performance and popularity.  This player-specific "salary" consists of a dollar amount, typically ranging from $1,000 to $10,000, which, to the extent the FanDuel customer selects such player, counts against the FanDuel user's overall "salary cap" for that day.

---

[5] "Salary cap" is a term of art specific to professional sports.  A salary cap is "a limit on the amount of money a team can spend on player salaries, either as a per-player limit or a total limit for the team's roster (or both). Several sports leagues have made salary caps mandatory, both as a method of keeping overall costs down, and in order to balance the league so a wealthy team cannot become dominant simply by buying all the top players. Salary caps are often the major issue in negotiations between management and players' unions."  http://www.investordictionary.com/definition/salary-cap#sthash.8EoRCodU.dpuf.  There is no such thing as a "salary cap" in college sports.

27.     The Defendant has created an elaborate point system for rewarding its customers based on the performance of the Class Members in inter-collegiate athletic contests.  The system awards "points" to a customer when a college athlete scores a touchdown (in football), or scores a basket (in basketball), or performs other statistically-recorded feats.  The Defendant's customers select players for a limited number of pre-defined spots on a "roster" consisting of positions such as Guard and Forward in basketball, and Quarterback and Wide Receiver in football, to construct an entire "team."   Customers are eligible to win prizes if the performance of the players selected for their "team" exceeds the performance of other customers competing for those prizes— as measured by the point system devised and implemented by Defendants.

28.     Given these two variables—the Defendant's fixed "salary cap" and the Defendant's performance-based point system— the prerogative of a FanDuel customer to "shop" from among a vast array of college players as potential lineup choices lies at the heart of the Daily Fantasy Sports value proposition itself.

29.     To wit, the customer is seeking to maximize the overall "return" (measured in points) he or she can obtain by virtue of their player selections.  If a customer selects one or two of the more "expensive" college athletes (as measured by those athletes' "salaries"), the customer is then constrained (by the Defendant-imposed "salary cap") to select less "expensive" college players for the remainder of their fantasy team— as measured, again, by the "salaries" assigned by the Defendant to those less "expensive" college athletes.

30.     In the words of one observer, "The…FanDuel salary caps place limits on the number of upper-tier players a fantasy owner can put on a roster, so the key to maximizing roster

production is figuring out which relatively low-cost players are worth putting in the lineup and which are better to avoid."[6]

31.     The "roster" of players assembled by each of Defendant's customers on a given day when engaged in the Defendant's on-line games is, in almost all cases, not an accurate reflection of reality.  That is to say, except for those highly isolated instances in which one of Defendant's customers elects to assemble their entire fantasy 'roster' from athletes that play for the same university, customers usually create, and compete with, rosters consisting of players from different universities.  This transmutes reality in that the different athletes, including Plaintiff, are not actually the teammates of the individuals selected as such by Defendant's customers.

32.     Capitalizing directly on college players' popularity and performance, Defendant promotes and operates its daily fantasy sports contests using college players' names and likenesses.

33.     Upon information and belief, the Defendant made representations, visual depictions, with associated numeric figures and commentary, with respect to Mr. Daniels's name, and offered attendant opportunities for its customers to profit from Mr. Daniels's services, in advance of several intercollegiate football games during Fall 2015.

34.     Upon information and belief and by way of example, Mr. Daniels' name appeared on the FanDuel site as a player whose services a FanDuel customer could profit from.  Specifically, upon information and belief, FanDuel offered its customers the right to add Mr. Daniels to the customer's "roster" in its fantasy college football gaming contests in advance of Northern Illinois' September 6, 2014 game against Northwestern University.  During that week, Mr. Daniels was one of among dozens of players, not only from NIU but also among other colleges, from whom

---

[6] *See* http://espn.go.com/college-football/story/_/id/12098850/overvalued-undervalued-players-daily-fantasy-games-college-football-playoff (last visited Dec. 12, 2015).

FanDuel customers could select for a "salary" as players for their fantasy 'rosters.' Third party speculators offered tips and recommendations for optimization of FanDuel college football fantasy "lineups" that week.[7]

35. Mr. Daniels did in fact play against Northwestern on September 6, 2014. Mr. Daniels did not consent to Defendant's use of Plaintiff's name. Nor did Plaintiff consent to any of Defendant's representations, visual depictions, or associated "salary" figures and commentary, with respect to Mr. Daniels, nor the offering of opportunities for Defendant's customers to profit from Plaintiff's services, on this or any other occasion.

36. Similarly, current Northern Illinois player Jordan Huff's name appeared on the FanDuel site routinely during the 2015 college football season, as a player whose services a FanDuel customer could profit from. In one such example, FanDuel offered its customers the right to add Mr. Huff to the customer's "roster" in advance of Northern Illinois' December 4, 2015 game against Bowling Green University. FanDuel so offered Mr. Huff's name and services in a variety of contests, including a contest awarding $7,500 to the winner called the "Fri[day] C[ollege] F[oot]B[all] RedShirt" contest. In this contest, Mr. Huff was one of among dozens of players, not only from NIU but also among other colleges, from whom FanDuel customers could select as players for their fantasy 'rosters.' FanDuel posted the following information including Mr. Huff's name, "salary" ($5,000), and "Latest Player News" on its site:

---

[7] *See, e.g.*, WEEKLY FANTASY COLLEGE FOOTBALL PICKS DAILY FANTASY EXPERT ADVICE, http://www.dailyfantasysportsrankings.com/2014/09/05/daily-fantasy-college-football-picks-for-fanduel-draftkings-saturday-early-games-9614-2/ (Sept. 5, 2014) (last visited January 18, 2016).



37. "FPPG", above, stands for "Fantasy Points Per Game." This is a Defendant-created measure of the Class Members' athletic performance in inter-collegiate contests, as a means of rewarding Defendant's customers.

38. A total of thirteen Northern Illinois players' names appeared on the FanDuel site during the 2015 season as athletes whose names and services a FanDuel customer could profit from (with specific assigned "salaries" for each week the player's name and services were offered by the Defendant on its site): Kenny Golladay; Ryan Graham; Joel Bouagnon; Tommylee Lewis, Aregeros Turner, Juwan Brescacin, Chad Beebe, Desroy Maxwell, D.J. Brown, Tommy Fiedler, Ezra Saffold, Clayton Glasper, and Mr. Huff.

39. The Defendant's gaming contests invite a cottage industry of speculators who offer counsel to other speculators hoping to maximize their returns on the daily fantasy gaming sites. These speculators advise on 'investments' in college players, including Plaintiff[s].

10

40.     On numerous documented occasions, third party speculators have opined concerning Plaintiff's fantasy "value," including the following instances:

- DRAFT KINGS: WEEK 13 (EARLY SATURDAY SLATE) – BREAKDOWN, (Nov. 20, 2014), http://collegefantasyfootballnews.com/tag/week/ ("…Akeem Daniels has 31 carries for 199 yards but hasn't recorded a touchdown.");

- PLAYER RANKINGS--WEEK 1 (Aug. 2014) ("Running Backs") (ranking Mr. Daniels as "No. 50" for fantasy purposes among running backs nationally), http://thecffsite.com/pages/week1rbrankings;

- PLAYER RANKINGS--WEEK 3 (Sept. 2014) ("Running Backs") (ranking Mr. Daniels as "No. 66" for fantasy purposes among running backs nationally), http://thecffsite.com/pages/runningbackrankings--week3-2014;

- MAC FANTASY PREVIEW: NORTHERN ILLINOIS' LYNCH-PIN (Aug. 16, 2013) http://searchwww.databasefootball.com/cfootball/showArticle.htm?id=18092 ("TEAM-BY-TEAM FANTASY STARS…Northern Illinois Huskies[:] Akeem Daniels");

- MID-AMERICAN FANTASY PREVIEW: FALCONS LOOKING TO SOAR (Aug. 18, 2014) http://admin1.rotowire.com/cfootball/showArticle.htm?id=21027 ("Fantasy Sleepers...Akeem Daniels, RB, Northern Illinois[:] Daniels missed all last season with a foot injury, but he is line for a significant role as a senior with a new quarterback in place for the Huskies. He had nine touchdowns while averaging 6.6 yards per carry in 2012, so with more carries all but certain Daniels carries instant value in deep leagues. If Cameron Stingily struggles or gets injured, Daniels would have excellent upside as Northern Illinois' No. 1 running back.");

- ROTOWWIRE: YOUR PREMIUM SOURCE FOR FANTASY SPORTS, http://www.rotowire.com/cfootball/player.htm?id=11993 ("Akeem Daniels…Past News Updates…October 22, 2014[:] Daniels (undisclosed) is hopeful to return for Saturday's matchup with Eastern Michigan.");

- COLLEGE FOOTBALL CHEAT SHEETS (Dec. 2013) https://rotogrinders.com/pages/college-football-cheat-sheets-158450 ("Running Backs to Avoid[:]...Akeem Daniels");

- WAIVER WIRE WATCH: PLAYERS TO PICK UP WEEK 2 http://anwww.databaseolympics.com/cfootball/showArticle.htm?id=15886 (Sept. 4, 2012) ("Akeem Daniels was singled out as the top Northern Illinois running back all offseason, with [Leighton] Settle declared the backup. Yet for no apparent reason[,] Daniels was given just a single carry against Iowa in Week 1, while Settle received 10…").

41.     Additional examples of speculators offering advice on FanDuel investments in college athletes abound.  On or around November 18, 2015, a speculator offered the following advice concerning Northern Illinois running backs Joel Bouagnon and Jordan Huff:

> Joel Bouagnon…[is a] must have[] for your roster. It's my opinion that if you're without [him] then you are without a chance of winning [on FanDuel]…Bouagnon ($8,400) ran for 156 yards and two touchdowns in his last outing and has scored in every game this season but one. He's amassed 1,100 rushing yards on the season and should add another hundred plus to that amount against Western Michigan.[8]

The writer further opined that

> "Jordan Huff could have close to twenty FanDuel points for the price of $5,600."[9]

42.      Similar to its college football contests, FanDuel creates "salaries" for hundreds of college basketball players, and FanDuel customers can choose whether to select those players for their "fantasy" lineups in Defendant's gaming contests.  On December 1, 2015, the Defendant offered customers the capability to select the services of Northwestern University basketball players Tre Demps and Bryant McIntosh, among other Northwestern players, for the "salaries" of $6,800 and $8,000, respectively.

43.     Defendant attracts users to its contests through sophisticated marketing campaigns designed to solicit new users.

44.     Defendant broadly advertises its daily fantasy sports website and contests on television and online, including broadcast and cable networks, YouTube, and in other forums.

45.     Defendant advertises its online games during college athletic competitions, including, *inter alia*, during radio broadcasts, such as during an intercollegiate basketball radio

---

[8] https://medium.com/@FakeTeamsGuy/fanduel-dfs-cheat-sheet-ncaaf-11-18-15-c18b4af7a209#.vu32jls7g (last visited Dec. 13, 2015).
[9] *Id.*

12

broadcast featuring the University of Illinois Fighting Illini on AM 670 (Chicago, IL) on the afternoon of December 5, 2015.

46.     To induce people to buy into the games, Defendant also promotes the success customers will have if they follow Defendant's recommendations, again using players' names and likenesses in the marketing, without permission. For example, Defendant prominently displays a photo of college football player Dak Prescott on their site:[10]



48.     On the same webpage (which is illustrative of similar such pages, with new content, created and disseminated by FanDuel on the Internet on a weekly basis), FanDuel goes on to offer advice to customers, including by invoking players the names of individual college athletes,

---

[10] See https://www.fanduel.com/insider/2015/09/03/6-strategies-for-setting-your-fanduel-college-football-lineups/ (last visited January 22, 2016).

including Mr. Prescott, Brett Hundley, TCU's Trevone Boykin, Clemson's Deshaun Watson, Tennessee's Joshua Dobbs, Melvin Gordon of Wisconsin, Seth Russell of Baylor, Jonnu Smith of Florida International, Tyler Higbee of Western Kentucky, and North Carolina's Marquise Williams by name:[11]

### 1. Know Coaches, Depth Chart and Offenses Even Better Than Individual Players

Unlike professional sports like the NFL, NBA and MLB, there are far more "gimme" games at the college level. FanDuel players are used to the concept of stacking MLB players against a weak pitcher at Coors Field or stacking Peyton Manning's receivers against the Tennessee Titans, but stacking takes on a whole new level with CFB.

In CFB, it might be theoretically possible to stack a different team just about every week thanks to the numerous big-name programs that schedule cupcakes and even more so because even top conferences have divisional opponents like Indiana and Purdue (Big Ten), Iowa State and Kansas (Big 12) or Vanderbilt and Kentucky (SEC), which give up a ton of points on a weekly basis.

Sometimes, it's as simple as finding a team at the top of the passing offense list who is matched up with a team at the bottom of the passing defense list. It seems simplistic, but sometimes's the shortest distance between two points really is just a straight line.

Offenses like Art Briles' system at Baylor and Doc Holliday's offense at Marshall have both stood the test of time through multiple talent pools. I also give a pass to those offenses who have performed well recently and still have the majority of their talent intact (looking at you, TCU and Western Kentucky).

### 2. Walk the Fine Line Between Matchup and Usage

Stacking against weak competition can also be a fool's errand if a coach decides to sit his starters in a blowout.

To take your FanDuel lineup to the next level, look at historical usage and coaching trends.

---

[11] *See* https://www.fanduel.com/insider/2015/09/03/6-strategies-for-setting-your-fanduel-college-football-lineups/ (last visited December 1, 2015).

In CFB games more than any other sport, it's important to do a little research in order to find out which coaches love love to pile it on in tune-up games and which will utilize their deep bench. A coach who scores 50 in a non-conference tuneup game might be patting himself on the back for his impressive win, but fantasy players who stacked his squad will be cursing him out for using five different running backs in the red zone.

For example: I can go to Baylor's 2014 schedule and learn that while the Bears scored 178 points in their first three games, they did so using a host of different passers (albeit due to a minor injury), running backs and receivers. Marshall, on the other hand, rode quarterback Rakeem Cato and most of his starting lineup to victory in all three games, putting up 134 points. Baylor's offense might have been more explosive, but Marshall's provided more consistent value for its top stars.

TCU, Oregon and Boise State are teams that have shown similar M.O.s in recent years.

In almost every circumstance, the amount of touches and targets a player gets matters just as much as the matchup. Playing stars against weaker opponents seems like a great strategy (and it's a fine entry point for beginners), but a great player against a tougher defense (within reason) will almost always end up as the better play because the coach utilizes him more.

When you can take advantage of the best of both worlds, FanDuel magic happens.

While setting my CFB lineups, I typically go back a few years and find offenses that have persistently been the highest-scoring units for three or four seasons. This eliminates the possibility that simple blips in the talent pool have made a system look good.

### 3. Value Starter Consistency More Than Sporadic Backup/Rotational Impact

Perhaps as an addendum to the first point, consider this simple adage: Don't get cute.

When looking at a juicy cupcake matchup, it can be awfully tempting to think along these lines: Well, since Team A is expected to win by 40 or 50 points, that means the backups are going to get a lot of burn. If I can spend a few thousand less on this guy and he ends up with a bunch of opportunities, that would be a great value.

Once in a while, that strategy results in a touchdown or two that can vault your team over the top. In the long run, you'll be left in the dust by FanDuelers who

went with high-caliber, but sure plays instead of trying to game the system. Unless you're actually living in a coach's head and know how he's going to run his rotation, go with the sure play.

Let's go back to Baylor for a second.

Seth Russell is taking over for Bryce Petty at quarterback and should be expected to put up some great numbers this season, because (as we already said) that Baylor offense always puts up some great points. Running back Shock Linwood can be expected to do the same.

I would think twice about playing either of those guys against a juicy cupcake, but I'm certainly not trying to get value at those slots by playing their backups even though I know Coach Briles will be giving those backups significant burn.

## 4. Spend Significantly On Dual-Threat Quarterbacks

In fact, don't try to find a value at the quarterback position at all.

Last season, building FanDuel teams around guys like Oregon's Marcus Mariota, UCLA's Brett Hundley and Mississippi State's Dak Prescott was a no-brainer, and for very good reason. Elite college passers (especially of the dual-threat variety) are worth the spend not only in terms of total points (in which college quarterbacks exceed the rest of their teams just like in the NFL), but also in the margin between the top scoring players in the nation and the average college starting quarterback.

The best running backs in the college game have to deal with a number of factors. Unlike in the NFL where the elite, workhorse back is a growing rarity, the college ranks have plenty of teams built around the run—whether by design or by necessity.

Outside of possibly Wisconsin's Melvin Gordon, no running back was consistently worth the high-dollar amount it cost to build a team around him in 2014, while a number of quarterbacks could lay claim to providing value regardless of what their price point happened to be.

Quarterbacks like Prescott, TCU's Trevone Boykin, Clemson's Deshaun Watson, Tennessee's Joshua Dobbs and North Carolina's Marquise Williams are never going to come cheap, but they will consistently produce the results you need.

Usage equals points in fantasy and someone who is throwing the ball 20-plus times a game while running another 7-10 times and doing both with efficiency is going to win you a lot of matchups.

### 5. Ignore the Tight End Position

In just about every facet of life, it's worthwhile to learn to stop "sweating the small stuff" or "majoring in minors," and while that's your awesome life-lesson for the day, it also makes a lot of sense in fantasy. To that point: There is no position in all of fantasy consistently less valuable than the college tight end.

They're a dying breed on the field and a waste of cap space on FanDuel.

Tight ends not only produce less than their peers at running back or wide receiver, but even the best of tight ends are consistently inconsistent when it comes to putting up high point totals.

Last season, Jonnu Smith of Florida International put up 12.3 FDPs per game, but much of that was weighted by a 34-point effort against Middle Tennessee State. Tyler Higbee of Western Kentucky scored 9.1 points per game but had his own massive day against Marshall to throw off his numbers.

I could sit here are preach consistency, but I'll take it one step further. Just spend your cap elsewhere!

Find a starter who consistently catches a few passes a week—even better if he grabs an occasional touchdown—and be happy spending $1,000-$1,500 less on the position to utilize that cash on a back or receiver.

### 6. Diversify Your News Sources

Thanks to the exponentially growing fantasy industry, many resources have become streamlined.

Just the other day, I was speaking to a long-time fantasy player, and we joked about how fax machines were the main source of information back then, and drafting meant everyone really needed to be in the same room to *really* make it work. Back then, the ticker at the bottom of the screen was the main source or instant information, and getting up to go grab a beverage could mean being the last one to know your own fantasy team was doomed.

Today, for NFL, NBA, MLB and NHL, we have a bevy of awesome resources starting with online repositories of news and analysis (like FanDuel Insider!) as well as instant alerts on mobile and tablet devices. A well-groomed fantasy veteran can easily lead the pack simply by knowing and taking advantage of all of the tools available.

Sadly, for CFB FanDuel veterans, there has to be a return to the old ways.

Local newspapers still lead the way for injury info on the vast majority of college programs. Learning which resources to trust, how to find them quickly and how to mine them for info takes some leg work, but it can pay dividends in the long run. Some times, it's as easy as learning how to make better use of Google, and putting the right keywords while setting the "search tools" to the right timeframe. Other times, Twitter can be a fantastic resource even though it can be filled with false information.

If there is any shortcut here, it's in the form of Vegas odds, which can be a wonderful resource for finding out which games are most likely to be the highest scoring, and which teams are likely to pile it on by the widest margins. From there, it's possible to adjust based on your other research, but getting just a few numbers provides a fantastic starting point.

Overall, CFB resources may still be in the middle ages, but learning to take advantage of what's out there can still provide FanDuel vets with the boost they need.

***Use promo code [FB18] to get FREE entry into a Week 1 fantasy football money league. Finish ANYWHERE in the top half to win real money. Enter now, change your lineup anytime before Sunday 9/13.[Click here to enter now].***

49.     FanDuel has offered "general strategy" pointers concerning participation in college basketball fantasy contests on its site, including, *inter alia*, the guidance that "freshmen can be inconsistent," and therefore FanDuel customers should be cautious about the "production" they can expect to receive if they elect to rely on the athletic performance of freshman to obtain profits:[12]

*by Josh Riddell*

College basketball [is new this season to FanDuel], so here are some thoughts to keep in mind as you set your lineup. The first contests start on November 15 – so take some time to hit the books before the season starts. Here is some [basic strategy]:

**1)     It's not only about points.** Players that [score] a ton of [points per game] are nice but can be less valuable than more balanced players if all

---

[12] https://www.fanduel.com/insider/2011/11/09/college-basketball-101-basic-strategy/

they do is score. If their shot is not falling, they have nothing else to fall back on to boost their Fanduel score. Find players that grab rebounds or get assists to help boost their score if they are struggling to score points on any given night.

2)    Pace **is crucial.** Know the teams that play up-tempo styles and those that grind it out and decrease the total number of possessions in a game. The teams that have a higher number of total possessions will have more points for their players to score. Players on low tempo teams can be valuable but they will not get as many opportunities to score as those that play in a high tempo system.

3)    Freshmen **can be inconsistent.** You never know how freshmen are going to adapt to the speed of the college game and their role with their new team. Are you going to get Michael Beasley production, with 4 30-point games in his first 5 games or Harrison Barnes production, who had average games to start the season (4 games with less than 10 points in his first ten games)? These highly regarded freshmen could be big producers for your team but also be prepared to be disappointed if they struggle.

4)    **Be aware of potential blowouts.** With the talent gap in college basketball, especially in the non-conference schedule, major conference teams will play teams that they will beat handily, which could limit the minutes the starters see. Although they may be able to match their overall production in the first half of these blowouts, the decrease in minutes could hurt their value. On the opposite side of this spectrum, this may be a good time to identify cheap bench players who may see a one game increase in minutes.

5)    **Identify players stepping into new roles.** Whether it is due to projected natural improvement as the player gets older, an increased role due to team  attrition or a new coach bringing a different style, the number of players stepping into new roles for the 2011-12 season are countless. If you can predict the players that are going to see an increase in their production level thanks to their new role, you are going to be a step ahead of the competition.

50.    Also for college basketball, Defendant FanDuel periodically offers an overview of "top scorers" that customers should consider 'owning'.  In November 2015,

those predictions included the prognosis that a student-athlete at Wichita State University would invariably "put up some big performances for FanDuel players"[13]:

**Kyle Wiltjer, F, Gonzaga**

The Gonzaga Bulldogs always seem like one of those teams that's capable of producing a talented scorer, and senior forward Kyle Wiltjer is no exception. In his first season with the Bulldogs last year, the 6'10" senior averaged 16.8 points and 6.2 rebounds per game after transferring away from Kentucky. As the clear leader for Gonzaga this year, Wiltjer should be able to fill the stat sheet on a consistent basis this season.

**Melo Trimble, G, Maryland**

Despite showing so much promise in his first season with the Terrapins, Melo Trimble decide (sic) to stay on for his sophomore year, and Maryland fans are thrilled about that. As a freshman, Trimble averaged 16.2 points, 3.0 assists and 1.3 steals per game. He'll have to work on being a more efficient all-around floor general for the Terrapins, but the 20-year-old is a popular choice early on for Big Ten Player of the Year.

**James Blackmon Jr., G, Indiana**

Yogi Ferrell gets a lot of attention for the Hoosiers, but sophomore guard James Blackmon Jr. completes what is one of the better starting backcourts in the nation. As a freshman, Blackmon put up 15.7 points per game, and was able to finish with 17 points and seven rebounds in Indiana's 88-49 win to start this year. If he can become a more efficient scorer, especially inside, Blackmon could help the Hoosiers make a serious run in the Big Ten.

**Ben Simmons, F, LSU**

Ben Simmons was considered by many to be the No. 1 overall recruit in the 2015 class, but we have yet to see what he can do at the college level. He's not going to blow people away with his outside game, but Simmons excels almost everywhere else on the floor. He should put up some big scoring numbers for the Tigers, but even if he doesn't, FanDuel players shouldn't be afraid to start him because of his ability to fill up the stat sheet.

**Georges Niang, F, Iowa State**

The Iowa State Cyclones were devastated when Georges Niang broke his foot at the end of last season, but the Cyclones have hope once again as their star

---

[13] https://www.fanduel.com/insider/2015/11/13/7-scorers-for-fanduel-players-to-know-in-college-basketball/

player enters his senior season. Niang has averaged at least 12 points per game every season with the Cyclones, and he returned on Friday by putting up 17 points and four rebounds in his team's opener against Colorado. He might have to shake off some rust early this season, but he could take over once we near the postseason.

**Fred VanVleet, G, Wichita State**

The past few years, Wichita State has emerged as a legitimate threat in the NCAA tournament. Fred VanVleet has been one of the big reasons why, averaging 13.6 points per game last season. Entering his senior year, the Shockers are already a top-1o team in the latest AP poll, and he'll be one of the main leaders for them. Playing in the Missouri Valley Conference should help VanVleet put up some big performances for FanDuel players as well.

**Denzel Valentine, G, Michigan State**

So many pro-ready prospects have come out of the Michigan State in the past, and Denzel Valentine might be the next big player developed by Tom Izzo. Valentine got off to a slow start in his college career, but broke out as a junior last season, averaging 14.5 points, 6.3 rebounds and 4.3 assists per game. Valentine will be the go-to scorer for the Spartans this year, so expect some big games from the senior guard over the next few months.

51.    FanDuel headlines the player overview cited immediately above with a prominent picture of University of Maryland guard Melo Trimble[14]:

---

[14] *See* https://www.fanduel.com/insider/2015/11/13/7-scorers-for-fanduel-players-to-know-in-college-basketball/ (last visited December 1, 2015).



52.     Upon information and belief, Defendant FanDuel enters into marketing partnerships with third parties.  These third parties, in turn, offer "tips" and "strategies" for FanDuel users to better profit off of Class Members' athletic endeavors.

53.     CBS Sports produces a weekly fantasy football show broadcast on YouTube, among other venues, entitled "Daily Fantasy Live."  The "Daily Fantasy Live" program is "Presented by FanDuel," according to one CBS Sports website.[15]   "Daily Fantasy Live" offers "[s]trategies and [a]dvice for [p]laying [d]aily [f]antasy [s]ports."  In one such video, CBS Sports offers advice to FanDuel users considering the dilemma of which college athlete to select for FanDuel college fantasy football contests on November 21, 2015— Joshua Doctson, college football player for Texas Christian University, or Cayleb Jones, college football player for the

---

[15] http://www.cbssports.com/fantasy/video/daily-fantasy-live.

University of Arizona— helpfully noting the two contrasting "salaries" associated with each such player: [16]



54.     Reflecting the symbiotic nature of the marketing partnership between the two companies, FanDuel broadcasts special promotional discount codes on the Daily Fantasy Live program for new users of FanDuel to utilize when signing up a new account on FanDuel:[17]

---

[16] https://www.youtube.com/watch?v=Oo4AvRniFjo.

[17] https://www.youtube.com/watch?v=Oo4AvRniFjo.



**Defendant Has Injured Plaintiff and the Class Members.**

55.     College athletes perform a valuable service when they compete in intercollegiate athletic contests.   Such services are highly valued, *inter alia*, by the colleges which the athletes attend, which routinely confer scholarships to the athletes in exchange for their services.

56.     College athletes' names are valuable property.

57.     For over four years and as of the date of this lawsuit, Defendant has willfully represented various "salaries" for the Class Members—each an *amateur* collegiate athlete— even though the athletes will not earn *any* salary for the subject games, or at any time during the subject season.

24

58.     Neither Plaintiff nor any of the Class Members have consented to Defendant's use of their names or likenesses to promote or to operate Defendant's daily fantasy sports contests.

59.     Neither Plaintiff nor any of the Class Members have consented to Defendant's publication of Defendant-created "salaries" for each Class Member college athlete, much less to the "purchase" of Class Members' services (as though Class Members were goods in a grocery store check-out counter) by FanDuel customers.

60.     The Nevada Gaming Commission and the New York State Attorney General are of the opinion that DFS comprises a form of gambling.[18] Of FanDuel, the New York State Attorney General has opined that FanDuel "runs a casino-style gambling operation—dubbed *daily* fantasy sports ("DFS")—where bettors can wager up to $10,000 per 'line-up' and enter for a chance to win jackpots of more than $1 million."[19]

61.     Discussing daily fantasy sports and their potential impact on college athletics, the International Business Times has noted the widespread concern, notably among college administrators, that "legalized sports gambling would open up athletics to corruption in the form of fixed outcomes and point-shaving."[20]

62.     Defendant has received the benefit of Plaintiff's services without paying for them.

---

[18] *See* "Nevada Says It Will Treat Daily Fantasy Sports Sites as Gambling," NEW YORK TIMES, Oct. 15, 2015, *available at* http://www.nytimes.com/2015/10/16/sports/gambling-regulators-block-daily-fantasy-sites-in-nevada.html?_r=0 (last visited December 1, 2015); *see* "Attorney General Tells FanDuel and FanDuel to Stop Taking Entries in New York," NEW YORK TIMES, Nov. 10, 2015, *available at* http://www.nytimes.com/2015/11/11/sports/football/FanDuel-fanduel-new-york-attorney-general-tells-fantasy-sites-to-stop-taking-bets-in-new-york.html (last visited December 3, 2015).

[19] *See* http://www.ag.ny.gov/pdfs/FD_Complaint.pdf (emphasis in the original), at ¶ 3.

[20] Thomas Barrabi, *NCAA Cracks Down On Daily Fantasy Sports, Gambling, Even As Pro Leagues, Media Partners Embrace Them*, INTERNATIONAL BUSINESS TIMES (Sept. 23, 2015), *available at* http://www.ibtimes.com/ncaa-cracks-down-daily-fantasy-sports-gambling-even-pro-leagues-media-partners-2110610 (last visited Jan. 18, 2016).

63.     Defendant's regular use of Plaintiff's name on their website is likely to create confusion among potential users as to Plaintiff's sponsorship or approval of Defendant and their daily fantasy college football and basketball gaming products.

64.     Defendant knowingly exploits Plaintiff Daniels' and Class Members' valuable publicity rights for its own financial gain through its far-reaching advertising campaigns and various daily fantasy sports products.

65.     Since its inception, Defendant's wide-ranging promotional efforts have prompted a substantial volume of customers to use their fantasy sports products.

66.     FanDuel paid out roughly $50 million in prized in 2012.  Defendant paid out $145 million in prize money in 2013.

67.     Upon information and belief, Defendant FanDuel has over 1 million "active, paying users."[21]

68.     When FanDuel takes in money from a customer, upon information and belief, roughly 90% of the monies deposited by the customer are re-allocated to contest winners, with FanDuel retaining the remainder as net revenues to its own company account.   FanDuel generated over $56 million in revenue to its own company account in 2014 and awarded $560 million in cash prizes.[22]

69.     Defendant FanDuel's revenues in 2015 should dramatically exceed $56 million, given that it has projected that it will hand out nearly $2 billion in cash prizes this year (nearly four times the cash prize payout in 2014).

---

[21] *See* https://www.fanduel.com/press (last visited Dec. 7, 2015).
[22] *See Storm of Criticism Engulfs DraftKings, FanDuel*, WALL STREET JOURNAL (Oct. 6, 2015), *available at* http://www.wsj.com/articles/storm-of-criticism-engulfs-draftkings-fanduel-1444107475 (last visited Jan. 20, 2016).

70.     Defendant derives significant, tangible financial benefit from Plaintiff's athletic efforts, but without Plaintiff's consent, and without compensating Plaintiff for the benefits Defendant has received.  Defendant derives its success operating daily fantasy college football and basketball contests on college players, like Plaintiff and Class Members, whose names and likenesses make Defendant's games possible.  Without the athletes and their on-the-field success, Defendant's daily fantasy college football and basketball contests would not exist.

71.     As a result of Defendant's knowing misappropriation and willful exploitation of Plaintiff's and Class Members' publicity rights, extensive use of Plaintiff's and Class Members' names, athletic profiles, and false "salary" artifices to create false endorsements for Defendant's fantasy contests, and retention of financial benefits from Plaintiff's and Class Members' athletic services without compensating for those services, Plaintiff and the Class Members have suffered extensive damages.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff sues on his own behalf and on behalf of a class of persons under Rule 23 of the Federal Rules of Civil Procedure.  Subject to modification after discovery and case development, the putative Class is tentatively defined as:

> All college football and basketball players on a college roster since 2011 whose names and/or likenesses Defendant used to operate its fantasy sports gaming contests from November 1, 2011 through the present.

73.     Excluded from the Class are the following individuals and/or entities: Defendant and their parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal,

state or local governments; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

74. In connection with its scheme, Defendant has misappropriated Plaintiff's name in commerce and used Plaintiff's name without authorization to generate money for themselves, and their customers, on a weekly basis.

75. Questions of law and fact common to the Class Members predominate over questions affecting only individual members, including:

> a. Whether Defendant uses college players' names and/or likenesses to promote its gaming contests;
>
> b. Whether Defendant uses college players' names and/or likenesses in its daily fantasy sports gaming contests;
>
> c. Whether such use is unlawful;
>
> d. Whether such use causes confusion;
>
> e. Whether Defendant's conduct infringes upon Class Members' publicity rights;
>
> f. Whether Defendant's conduct violates 15 U.S.C. § 1125;
>
> g. Whether Defendant's customers have profited from Class Members' rendering of services;
>
> h. Whether Defendant has profited from Class Members' rendering of services;
>
> i. Whether Plaintiff and the Class Members have been damaged by Defendant's conduct and the amount of such damage;
>
> j. Whether Defendant should disgorge all gross profits on its college football and basketball gaming contests and the amount of such gross profits.

76.     Separate actions by individual members would risk inconsistent or varying judgments, which would establish incompatible standards of conduct for Defendant and impair or impede Class Members' ability to pursue their claims to resolution.

77.     Defendant has acted on grounds generally applicable to the Class, making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate.

78.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

79.     The class is so numerous that joinder of all members is impracticable. Upon information and belief, there are more than 2,000 members in the United States. The precise number of separate individuals who are members of the Class is identifiable and ascertainable based on Defendant's records.

80.     Each Defendant engaged in a course of conduct giving rise to violations of the legal rights sought to be enforced uniformly by the Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Therefore, individual questions, if any, pale in comparison to the numerous common questions presented.

81.     The representative Plaintiff's claims are typical of those of the Class, as all members of the Class are similarly affected by Defendant's uniform conduct as alleged.

82.     The injuries sustained by members of the Class flow, in each instance, from a common nucleus of operative facts.  Plaintiff's claims are typical of the Class claims, as they arise out of the same course of conduct and the same legal theories.  Plaintiff challenges Defendant's practices and conduct as to the Class as a whole.

83.     Given the similar nature of the Class Members' claims and the absence of material differences in the statutes and common laws upon which the Class Members' claims are based, a nationwide class will be easily managed by the Court and the parties.

84.     Defendant has acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Class, supporting the imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class.

85.     The class representative has no interests which conflict with or are adverse to those of the other Class Members.

86.     Plaintiff reserves the right to revise the above class definition based on facts learned in discovery.

### COUNT I –Violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)

87.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1 through 86.

88.     Defendant has utilized Plaintiff's name to generate revenues for itself, and "gaming" (*i.e.*, gambling) profits for others.   Indeed, Defendant has predicated their entire business models on the notion that commercial value attends to the Plaintiff and Class Members' names, assigning "salaries" to each Class Member— even though the Class Members did not draw any salary of any type for playing their collegiate sport.

89.     Though Defendant has, upon information and belief, assigned Plaintiff "salaries" in varying amounts ranging up to $10,000 per athletic contest, Defendant has failed to actually confer any "salary" or monies of any kind to the Plaintiff.

90.     Neither Plaintiff nor any of the Class Members consented to the subject "salary" information being associated with their names, much less utilization of their names, without consent, by third parties to generate profits on the strength of Class Members' athletic endeavors.

91.     Defendant has exploited Plaintiff's and Class Members' names and likenesses without their consent to promote its daily fantasy college football and basketball gaming product, to solicit users to its website, and ultimately to collect entry fees.

92.     Defendant's use of Plaintiff's and Class Members' name and likeness is likely to confuse Defendant's potential consumers about any connection or association between Plaintiff and Class Members and Defendant, or as to Plaintiff's and Class Members' sponsorship or approval of Defendant FanDuel and its daily fantasy college football and basketball gaming products.

93.     As a result of Defendant's conduct, Plaintiff has been injured. To obtain the Plaintiff's and Class Members' consent to implement its otherwise unlawful business model, Defendant would have to compensate Plaintiff and all Class Members financially, directly or indirectly, for making a market on Plaintiff's and Class Members' names and for the use of Plaintiff's and the Class Members' names, and, further, to trade on Plaintiff's and Class Members' rendering of services.

94.     Plaintiff has, additionally, been injured because Defendant's conduct has harmed Plaintiff and the Class Members by putting them in an unwanted state of fear and concern of the risk of being contacted by speculators who have a financial interest in Plaintiff and Class Members' performance in a particular athletic contest.  Such speculators range in ages and hail from both Plaintiff's and Class Members' fellow student bodies (*i.e.*, walk around the same campuses) as well as the walls outside campus.  By creating a class of millions of speculators in the U.S. whose

financial fortunes in the Defendant's virtual stock market rise and fall in direct proportion with the Plaintiff and Class Members' endeavors, Defendant has immeasurably altered the college football and basketball environment in which Plaintiff and Class Members compete. In addition to the reasonable concern that speculators may urge that Plaintiff and Class Members adjust their performance in response to the speculators' stated desires, Defendant's unlawful business model puts Plaintiff and Class Members at unwanted risk of contact with speculators whose interests align with "corruption in the form of fixed outcomes and point-shaving."[23]

**COUNT II – Right of Publicity (New York Law) (New York Civil Rights Law § 51)**

95.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1 through 94.

96.     Defendant has infringed upon Plaintiff's and Class Members' right of publicity.

97.     As detailed above, Defendant, acting from its offices in New York state, has made use of Plaintiff's and Class Members' names for purposes of operation of its website, and in New York state and numerous other states for advertising purposes.

98.     Defendant has used Plaintiff's and Class Members' names and in numerous other states for purposes of trade.

99.     The Plaintiff, like the other Class Members, never consented to "salaries" being associated with his name on behalf of, and for the benefit of, the Defendant or Defendant's customers.

---

[23] Thomas Barrabi, *NCAA Cracks Down On Daily Fantasy Sports, Gambling, Even As Pro Leagues, Media Partners Embrace Them*, INTERNATIONAL BUSINESS TIMES (Sept. 23, 2015), *available at* http://www.ibtimes.com/ncaa-cracks-down-daily-fantasy-sports-gambling-even-pro-leagues-media-partners-2110610 (last visited Jan. 18, 2016).

100.    The Plaintiff, like the other Class Members, never consented to their names or likenesses being used on behalf of, and for the benefit of, the Defendant or Defendant's customers.

101.    Defendant has knowingly used Plaintiff's and Class Members' names, and likenesses, in New York state and in numerous other states for advertising purposes and for purposes of trade without obtaining Plaintiff's and Class Members' prior written consent.

102.    The trading of Plaintiff's and the Class Members' names, the use of Plaintiff's and Class Members' names and images for promotion of Defendant's site, and the purported grant of "ownership" in Plaintiff and the Class Members, damages and is likely to damage Plaintiff and the Class Members by depriving them of compensation for the Defendant's use of their names and likenesses, by putting them in an unwanted state of fear and concern of the risk of being contacted by speculators who have a financial interest in Plaintiff and the Class Members' performance in a particular athletic contest, by associating them unwittingly with sites deemed as gambling sites in multiple jurisdictions, and, further, by commoditizing Plaintiff against his will.

103.    Plaintiff and the Class Members seek to prevent and restrain any further use by Defendant of Plaintiff or Class Members' names and likenesses, and also seek damages for injuries sustained by reason of Defendant's use.

104.    Plaintiff and the Class Members seek full restitution of Defendant's gross profits acquired as a result of its infringement upon Plaintiff's and Class Members' rights of publicity.

**COUNT III – Unjust Enrichment**

105.    Plaintiff incorporates by reference the allegations set forth above in paragraphs 1 through 104.

106.    Defendant has engaged in a scheme of purporting to sell 'ownership' stakes in the players and their exploits for one day periods, and without Plaintiff's or the Class Members' authorization.

107.    The Plaintiff, like the other Class Members, never consented to perform services on behalf of, and for the benefit of, the Defendant or Defendant's customers.

108.    The Plaintiff and the other Class Members never consented to their names and likenesses being used on behalf of, and for the benefit of, the Defendant or Defendant's customers.

109.    The Plaintiff, like the other Class Members, never consented to "salaries" being associated with their names and likenesses on behalf of, and for the benefit of, the Defendant or Defendant's customers.

110.    The Defendant has been enriched from its use of Plaintiff's and the other Class Members' names and services.

111.    The Defendant's enrichment has come at Plaintiff's and the Class Members' expense.

112.    It is against equity and good conscience to permit Defendant to retain the gross profits it has accumulated utilizing Plaintiff's and Class Members' name and services without Class Members' consent.

113.    Plaintiff and the Class Members seek full restitution of Defendant's gross profits attained from Class Members' services and from Defendant's use of Class Members' names.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief from this Court as follows:

a.    An award of damages for Defendant's violations of 15 U.S.C. § 1125;

b. Certification of the action as a Class Action under Rule 23 of the Federal

Rules of Civil Procedure, appointment of Plaintiff as Class Representative, and appointment of counsel of record as Class Counsel;

c. An award of damages for Defendant's violations of Plaintiff's and the Class Members' rights of publicity;

d. Pursuant to New York Civil Rights Law § 51, an award of exemplary damages for Defendant's knowing use of Class Members' names, and pictures of various Class Members, for advertising purposes, and for the purposes of trade, without having first obtained the written consent of any of the Class Members;

e. An award for disgorgement of all gross profits earned by Defendant from operating and promoting its daily fantasy sports contests using Plaintiff's and the Class Members' names and/or likenesses;

f. An award of damages for Defendant's unjust enrichment via uncompensated financial rewards received from Class Members' services;

g. An injunction enjoining Defendant from the future use of Plaintiff's and Class Members' names and/or likenesses in conjunction with any aspect of its operation of its daily fantasy sports contests;

h. Treble damages, prejudgment interest, and costs, as per the Lanham Act;

i. An award for Plaintiff's costs and attorneys' fees in bringing this action; and

j. Any other relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiff demands a jury trial on all issues triable by jury.

Respectfully submitted,


_____/s/_____
W. Clifton Holmes
The Holmes Law Group, Ltd.
230 W. Superior St., 2F
Chicago, IL 60654
holmes@theholmeslawgroup.com
(312) 721-0779 (t)


Counsel for Plaintiff


January 27, 2016